STOKER, Judge.
This is a suit in redhibition. The plaintiff, Edmundson Brothers d/b/a Evangeline Foods (Evangeline), is a manufacturer of hot sauce. The defendant, Colony Import and Export Corporation (Colony), is in the business of importing natural gums for domestic resale. F.M. Carriere & Son, Inc. (Carriere) is a New Orleans based sales agent or broker for Colony. National Union Fire Insurance Company of Pittsburg is Colony’s insurer. The facts of this case arise out of a sale of guar gum to Evangeline for use as a stabilizer in its export hot sauce. After using the guar gum in production, Evangeline experienced a gross separation in its product which made it unsalable for export purposes. Evangeline alleged that the guar gum did not do what defendants represented it would do and was therefore defective, entitling plaintiff to rescission of the sale, damages and attorneys fees. Defendants answered asserting that the problems experienced by plaintiff were a result of plaintiffs misuse or misapplication of the product.
After trial on the merits, the trial court found that the action was one sounding in products liability rather than redhibition because plaintiff was unable to return or tender the product. The trial court found that the guar gum caused the gross separation in plaintiffs hot sauce, but also found that plaintiff was negligent in failing to adequately test the guar gum as a stabilizer in its hot sauce. The defendants and plaintiff were each found to be 50% at fault. The trial court found that plaintiff sustained damages in the amount of $90,-328 which was then reduced by plaintiffs 50% apportionment of fault. Judgment was rendered in accordance with these findings.
Plaintiff has appealed the judgment of the trial court, asserting that the trial court erred in finding that the action was not properly one in redhibition and in finding that plaintiff was at fault. The defendants have answered plaintiffs appeal seeking reversal of the judgment in favor of plaintiff and the dismissal of plaintiffs claims.
FACTS
In late December of 1983 or the early part of January of 1984, Ben Mauthe (Mauthe), a sales agent with Carriere, approached Evangeline’s president, David Forlani (Forlani), and production manager, Ken Hopkins (Hopkins), about the use of guar gum as a stabilizer in its hot sauce. Stabilizers are used in some hot sauces to hold the pepper particles in suspension in the solution, thus preventing the solids from separating from the liquids. At the time, Evangeline was using Hercules CMC, a synthetic product, as its stabilizer. Mauthe told Forlani and Hopkins that at least one other hot sauce manufacturer was successfully using guar gum in its product and displayed a bottle of Trappey’s Bull Brand hot sauce. Mauthe told them that guar gum cost approximately $.70 per pound compared to Hercules CMC’s cost of $2.30 per pound; and, even if they had to double the amount used, Evangeline would realize a cost savings. Both Forlani and Hopkins were impressed by this information.
On or about January 6 Mauthe sent Hopkins a one-pound sample of guar gum along with Colony’s literature on guar gum and miscellaneous other information. Hopkins experimented with the guar gum in his lab and found that it appeared to perform satisfactorily. Evangeline decided to do some more testing with the guar gum and on or about February 7 ordered a 50-pound sack of guar gum from Colony through Carriere. Hopkins ran tests using both the Hercules CMC and guar gum in an actual production of their export hot sauce formula. Hopkins made 500 gallons using 25 pounds of CMC and 500 gallons using 25 pounds of guar gum. The guar gum appeared to perform as well as the CMC, and samples were drawn for the purpose of observing it more closely over a period of time. After approximately five weeks, no separation appeared in the test samples, so Evangeline decided to order guar gum for use in the production of its export hot sauce. An order was placed on or about March 22, 1984 for thirty-two 50-pound *1232 sacks of guar gum from Colony through Carriere. Colony sent an additional brochure on its gums to Evangeline at that time.
On April 13, 1984 Evangeline began production of its export hot sauce under the “Pepper King” label for Fairco in New Orleans. Evangeline was to provide Fairco with 20,000 cases of “Pepper King” for export to Saudi Arabia. Evangeline had approximately 1800 to 2000 cases already packaged in which Hercules CMC had been used. The remaining approximately 18,000 cases were to be manufactured with guar gum. The hot sauce was made in batches of 2000 gallons using 50 pounds of guar gum per batch. The hot sauce was packaged and shipped until April 23. On that day a representative of Fairco called Forla-ni and notified him that the “Pepper King” had separated and was unusable by Fairco. (The sale of separated hot sauce is prohibited by law in Saudi Arabia.) Forlani and Hopkins immediately contacted Mauthe who met them at the Fairco dock in New Orleans. The cases of “Pepper King” were examined and were found to have separated. Hopkins halted production of “Pepper King” with the guar gum and resumed production with Hercules CMC. Fairco returned the separated hot sauce to Evangeline. The order was eventually filled with “Pepper King” containing CMC without further incident.
Colony was notified about the problem and a credit was issued for a second order of guar gum which had been placed by Evangeline. Evangeline did not return the guar gum remaining from the first order and made demand upon Colony for the losses it occasioned from the use of the guar gum in the “Pepper King” hot sauce. The suit which is before us on appeal was then filed.
DID PLAINTIFF PROVE A REDHIBITORY DEFECT?
We note at the outset that we disagree with the trial court’s conclusion that this suit is a products liability action rather than a redhibitory action. The trial court based that finding on the fact that plaintiff was unable to return or tender the guar gum and that return or tender of the thing is essential in an action in redhibition. Return or tender is required except in the instance where the thing has perished through the badness of its quality. LSA-C.C. art. 2532. We do not think that plaintiff alleged or attempted to prove that the guar gum was unreasonably dangerous in its normal use as required in a products liability claim. Oatis v. Catalytic, Inc., 433 So.2d 328 (La.App. 3d Cir.), writs denied, 441 So.2d 210 and 441 So.2d 215 (La.1983). If plaintiff proved that it was unable to return the guar gum because of the badness of its quality, no tender or return would be necessary. However, the record does reflect that some portion of the guar gum remained, unused, and was not tendered or returned. Nevertheless, we find that the claim is more properly examined in light of the law and jurisprudence governing redhibitory actions; LSA-C.C. arts. 2520-2540.
“Redhibition is the avoidance of a sale on account of some vice or defect in the thing sold, which renders it either absolutely useless, or its use so inconvenient and imperfect, that it must be supposed that the buyer would not have purchased it, had he known of the vice.” LSA-C.C. art. 2520. The seller is bound by an implied warranty that the product is free from hidden defects and is reasonably fit for its intended use. Rey v. Cuccia, 298 So.2d 840 (La.1974). A defect, as contemplated by Article 2520, means that the thing has some physical imperfection or deformity; or it lacks necessary components or a certain level of quality. Harper v. Coleman Chrysler-Plymouth-Dodge, Inc., 510 So.2d 1366 (La.App. 3d Cir.1987). A buyer may also prevail in a redhibitory action when there has been a good faith declaration by the seller that the thing possesses some quality which it does not possess, if this quality was the principal motive for making the purchase, even though the lack of the quality does not constitute a vice or defect under Article 2520. LSA-C.C. art. 2592; Fusilier v. Ardoin, 266 So.2d 531 (La.App. 3d Cir.1972).
*1233 Our inquiry is twofold: (1) did Colony and Carriere represent to Evangeline that guar gum has the ability to stabilize their hot sauce, or any other product, when in fact it does not and cannot; and (2) did the plaintiff prove by a preponderance of the evidence that the batch of guar gum sent by Colony and used in the production of the “Pepper King” sauce had some defect which rendered it useless for its intended purpose?
There is no question that Colony and its representatives hold guar gum out as an effective stabilizer in the food industry. There is no reason to doubt that it is. Plaintiff did not show that guar gum is ineffective when used in other food products. Mauthe represented to Evangeline that at least one of its competitors was using guar gum in hot sauce with apparent success. Mauthe suggested that guar gum could be an economical alternative to Hercules CMC. Evangeline examined the brochures sent by Carriere and Colony which contained very general information about gums and guidelines for their uses, but made no further inquiries of Colony concerning the use of guar gum in its product. Hopkins testified that he would not expect Colony to advise Evangeline as to specific amounts to be used; that would be left up to Evangeline to determine.
After the April incident, Evangeline hired a chemist, Wilma Subra, to test the properties of the guar gum. Hopkins gave Ms. Subra two samples of guar, one from the original 50-pound sack and one from the 32-sack order. He also gave her a sample of Hercules CMC. Ms. Subra put the samples into solution using water and found that both samples of guar gum settled out to the bottom of the container while the Hercules CMC stayed in solution. Her opinion was that guar gum does not perform as a stabilizer as represented in Colony’s brochures.
Ms. Subra’s results, however, are contradicted by Hopkins’ own test results. In the first two tests done by Hopkins the guar gum performed satisfactorily (stayed in suspension). No other tests were run on the guar gum and Hopkins did not test the separated “Pepper King” to determine what could have occurred to cause the separation.
We do not find that plaintiff proved that guar gum does not stabilize food products. Nowhere in the record do we find even the assertion that Colony through its agent expressly warranted that guar gum would stabilize Evangeline’s hot sauce. Colony’s representatives testified generally that the use of gums as stabilizers in food products was something that each manufacturer had to experiment with. Hopkins admitted that finding the correct amount for a formula was determined by trial and error. We do not find that plaintiff proved that Colony’s product lacked the quality to stabilize food products that Colony represented that it had.
The remaining question is whether the particular batch of guar gum that went into the production of the “Pepper King” sauce was proven defective. As stated above, no tests were run on the “Pepper King” by Hopkins to determine the cause of the separation. To save money, he simply shut down production with the guar gum and commenced production with CMC. Evangeline did not ask Colony for assistance in discovering what the problem might be. Colony did in fact perform tests on samples of Evangeline’s hot sauce and determined that guar gum was probably not an additive to the hot sauce.
It is abundantly clear from Colony’s brochure on gums that the method of application and concentration of the gum are critical to its ability to function properly. Improper application will result in inadequate hydration of the gum and inadequate concentrations can affect the gum’s ability to suspend the solids in solution.
Evangeline used 25 pounds of CMC in a 2000-gallon batch of “Pepper King” and was told by Mauthe that guar gum could be used the same way as the CMC. In the two 500-gallon test batches, Hopkins added 25 pounds of CMC and guar gum for a concentration of 5% of total solution. In production of the 2000-gallon batches made between April 13 and April 23, Hopkins added 50 pounds of guar gum for a *1234 concentration of 2.5% of total solution. The gum was added to 200 to 250 gallons of water under vigorous agitation and allowed to hydrate for one-half hour to 45 minutes before adding it to the salt, mash and vinegar. Gary Wine, Colony’s quality control chemist, testified that with guar gum full hydration occurs in 24 hours and that it should sit that long. Wine and Herman Muhlsteff, Colony’s vice president, testified that the ph of the product is important in determining concentrations. The lower the ph, the more gum would be needed. Evangeline’s product is a low ph product. Muhlsteff testified that he recommends that manufacturers do a shelf life stability test letting the product sit in incubation for six months to one year. In fact, Muhlsteff would not have recommended guar gum to Evangeline, but Colony was not consulted. Colony’s experts and representatives opined that the cause of the separation was improper application resulting in a failure of hydration, an inadequate concentration of the guar gum, or simply failure to add the guar gum at all.
After a careful and painstaking review of the factual and technical evidence presented by plaintiff and defendants, we conclude as did the trial court that plaintiff failed to adequately test the guar gum for use in its product. There are so many factors and variables (set out in Colony’s brochures) which influence the effectiveness of the guar gum that Evangeline’s decision to use the guar gum in production after only six weeks seems ill-advised. Economic considerations prompted the decision based upon what appeared to be satisfactory test results after such a short period.
It appears to us more likely that some error in deciding what concentration to use or in improperly dispersing the gum caused the separation. Evangeline never availed itself of the technical expertise available through Colony during the testing process and did not attempt to discover or correct the actual cause of the separation problem after it occurred.
Based upon the evidence in the record before us, we conclude and so hold that Evangeline failed to prove, by a preponderance of the evidence, any defect in the guar gum sold by Colony through Carriere. The trial court was clearly wrong in finding that the guar gum caused the separation in the plaintiff’s hot sauce. For these reasons, the judgment of the trial court is reversed insofar as it easts the defendants in judgment for plaintiff’s damages and plaintiff’s claims against the defendants are hereby dismissed. The costs of both the proceedings below and on appeal are assessed against the plaintiff.
REVERSED.